**SIGNED THIS: January 27, 2016**

_____
**Mary P. Gorman
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | Case No. 14-71585 |
| BRENDA J. BUTLER, ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| BRENDA J. BUTLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 14-07069 |
| ) | |
| EDUCATIONAL CREDIT ) | |
| MANAGEMENT CORPORATION, ) | |
| ) | |
| Defendant. ) | |

# O P I N I O N

Before the Court is an adversary proceeding brought by Chapter 7 debtor Brenda J. Butler ("Debtor") to determine the dischargeability of her student loan debt. Because the Debtor has not demonstrated that paying the debt will impose an undue hardship upon her, the debt will be excepted from her discharge.

**I. Factual and Procedural Background**

The Debtor commenced this Chapter 7 case on August 29, 2014. On her Schedule F - Creditors Holding Unsecured Nonpriority Claims, she listed about $7000 in credit card and medical debts. She also listed student loan debt totaling nearly $32,000. The Debtor does not own any real property. Her Schedule B - Personal Property lists only $2200 worth of property, including a 2001 Saturn SC1 with 147,000 miles on it. At the time of filing, her monthly income was $1879 and her monthly expenses were $2085. The Debtor received her discharge on December 11, 2014.

The Debtor brought this adversary proceeding against the Student Assistance Foundation to determine the dischargeability of her student loans. She twice amended her complaint and Educational Credit Management Corporation ("ECMC") was eventually substituted as the proper defendant as it is the current holder of the Debtor's student loans.

At the trial on the Debtor's second amended complaint, the Debtor was the sole witness. She testified that she incurred her student loan debt attending Chapman University in Orange, California, where she earned a Bachelor of Arts degree in English, specializing in creative writing. Between 1995, when she graduated, and 1999, the Debtor worked in the financial services sector in

California. Her first position involved data entry, and she earned an annual salary of about $24,000. She then worked in a customer service position, earning a promotion to department supervisor and a final annual salary of about $35,000. The Debtor moved to Chicago, Illinois, worked for two years as a flight attendant earning about $27,000 per year, and then returned to the financial services sector where her yearly salary was over $35,000. She later took a job at a bank, earning a similar salary, but she lost that job during the 2008 financial crisis. Between 2008 and 2011, the Debtor worked at a variety of jobs, but she was not in a permanent, full-time position for any significant period of time.

Between 2011 and 2013, the Debtor worked at an insurance agency in Schaumburg, Illinois, where she eventually earned over $30,000 per year as a licensed insurance producer. In 2013, after her father passed away, she moved to Decatur, Illinois, to live with her mother and obtained employment at a Decatur law firm. In May 2015, while this adversary proceeding was pending, the Debtor was laid off from the law firm. She testified that she was receiving unemployment compensation and searching for work. The Debtor said that she is willing to expand her job search beyond Central Illinois, but that if she found employment elsewhere, she would have to live on her own, significantly increasing her living expenses.

When the Debtor graduated from college in 1995, she owed approximately $13,787.74 for four student loans, all with fifteen-year repayment periods. Later that year, the Debtor consolidated the four loans into a single loan. The consolidated loan had an original balance, including capitalized interest, of

$14,505.19, a nine percent annual interest rate, and a fifteen-year repayment period. The Debtor refinanced her consolidation loan in May 2001 and her accrued interest was again capitalized, resulting in a new principal balance of $16,564.10. She agreed to pay the refinanced loan by making 103 monthly payments of $230.00 with a final payment of $221.77 due in January 2010.

The Debtor provided a partial payment history dating back to January 2000, showing that she made regular monthly payments of $227.74 between May 2000 and April 2001, but then did not make any payments until February 2004. Thereafter, she made payments in varying amounts, but by the middle of 2008, the total balance due had increased to $22,035.71, which included at least $5500 in collection costs and fees. Additional collection costs of $6300 were assessed in September 2011.

The Debtor received a notice from ECMC in October 2011 that her loan balance had increased to $32,950.30, and that ECMC would garnish her wages if she did not enter into a repayment plan. The Debtor made some payments under an agreed repayment plan, but then applied for the Federal Family Education Loan Program's Income Based Repayment Plan ("IBR") in October 2012. The Debtor's IBR payments for the first twelve months were $131.58, and were scheduled to increase to $403.26 for another 128 months if she did not provide annual employment documentation. If the Debtor remained in the IBR program for the entire repayment period, and her income was not sufficient to fully pay her student loans earlier, her final IBR payment would be due in October 2037.

Between December 2012 and September 2013, the Debtor made monthly

payments of at least the amount owed under her IBR plan. In August 2013, the Debtor submitted her required annual documentation for IBR, but in November 2013, she applied for unemployment deferment. After finding new employment, the Debtor's payments were set at $118.90 for the first twelve months, starting in August 2014, before presumptively increasing to $403.26 for 148 months. In addition to at least two payments of $205.15, the Debtor made three payments of $118.90 in late 2014 before filing her bankruptcy petition. The Debtor made at least $15,000 of payments on her student loans between 2000 and the present. The Debtor testified that she also made payments between 1995 and 2000, but no documentation was provided and her recollection of those payments was limited.

The Debtor testified that she is in good health and has no disabilities that impair her ability to find a job. She is forty-four years old, unmarried, and has no dependents. She currently lives with her mother in Decatur, Illinois, where they share housing and other living expenses. The Debtor's principal source of income is currently unemployment benefits of $274 per week. The Debtor provided a revised Schedule I and Schedule J to update her current income and expenses, excluding student loan payments, since losing her last job and beginning to receive unemployment benefits. These documents show monthly income of $1043 and expenses of the same amount. The Debtor testified that her unemployment benefits were scheduled to terminate in November 2015, and that she does not have any significant savings.

Both parties presented legal arguments at the conclusion of the trial. The

matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). The dispute here stems from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code. It may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011).

## III. Analysis

The Debtor seeks to discharge her student loan debt under §523(a)(8). 11 U.S.C. §523(a)(8). That subsection provides that certain educational loan debts are not discharged in a Chapter 7 bankruptcy "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents[.]" *Id.*

The Code does not define "undue hardship," but the Seventh Circuit has adopted the Second Circuit's *Brunner* test for determining the dischargeability of student loan debt. *Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (following *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)).

"[U]ndue hardship" requir[es] a three-part showing (1) that the debtor

-6-

cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* (citation omitted). To obtain a discharge of her student loans, the Debtor must prove each element of the *Brunner* test by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002).

### A. The Debtor is Able to Maintain a Minimal Standard of Living If Forced to Repay The Loans

The first prong of the *Brunner* test requires evaluating the Debtor's near-term financial circumstances. *O'Hearn v. Educ. Credit Mgmt. Corp.* (*In re O'Hearn*), 339 F.3d 559, 565 (7th Cir. 2003). This involves looking not only at the Debtor's current monthly income and expenses, but also whether the Debtor could, hypothetically, adjust her budget in the short-term to make room for student loan payments. *See Educ. Credit Mgmt. Corp. v. Rhodes* (*In re Rhodes*), 464 B.R. 918, 923 (W.D. Wash. 2012) (finding first prong not met where, though debtor was presently unemployed, he was readily employable); *Larson v. United States* (*In re Larson*), 426 B.R. 782, 790 (Bankr. N.D. Ill. 2010) (discussing whether certain expenses "should be disregarded or treated as funds available for the repayment of" student loan debt).

A minimal standard of living includes sufficient expenditures "for basic necessities such as food, shelter, clothing and medical treatment" as well as a small allocation for discretionary or recreational purposes. *Larson*, 426 B.R. at

789. A debtor need not live in abject poverty to satisfy this element. *Id.* However, a debtor must make significant efforts to "live within the strictures of a frugal budget for the foreseeable future." *Id.* (citation omitted).

In *Krieger*, the Seventh Circuit found that this first prong was met where the debtor was "essentially out of the money economy and living a rural, subsistence life" without any assets or income. *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 885 (7th Cir. 2013). In that case, the debtor had been unemployed for over twenty-five years, lived with her mother in a rural area with few jobs, failed to find work despite submitting around 200 job applications in the prior decade, and was subsisting only on government benefits. *Id.* at 883-85.

At the time of the hearing, there is no question that the Debtor's income, expenses, and assets were insufficient to maintain a minimal standard of living while making student loan payments. The Debtor was then receiving unemployment benefits, which were to terminate within a month and barely covered necessities like food, clothing, and health care. And with the expected termination of her unemployment benefits, the Debtor had virtually no resources to support herself. Thus, the Debtor's current income suggests that she is unable to maintain a minimal standard of living.

Further, even when she was working, the Debtor's actual living expenses were minimal, and there was little room in her budget for any reductions. Yet, despite her obviously meager budget, ECMC argued that the Debtor's cell phone, internet, cigarette, and pet care expenses could be reduced or eliminated to free up funds for the Debtor's IBR payments.

But the contested expenses are not problematic. The Debtor's modest cell phone and internet plan is not only a reasonable living expense, it is necessary to further the Debtor's job search. The Debtor uses both the internet and her phone to contact potential employers. Depriving the Debtor of these resources would make it more difficult for the Debtor to get a job and resume repaying her student loans.

The Debtor's tobacco and pet care expenses are also not unreasonable as part of her overall frugal budget. A minimal standard of living includes "the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *Larson*, 426 B.R. at 791 (citations omitted). Further, a discharge of student loan debt should not be denied when an otherwise frugal budget contains some expenses that could be deemed unnecessary. *Id.* at 792 (citation omitted). The Debtor's budget for these items is frugal by any measure and ECMC's criticism of her limited pet care and tobacco expenses is not persuasive. Under the Debtor's current circumstances, no amount of belt-tightening would result in a meaningful surplus of funds to pay ECMC.

The Debtor is clearly trying to keep her expenses as low as possible while preserving her ability to continue her job search and maintain a minimal standard of living. Notwithstanding the Debtor's current financial condition, ECMC argued that the Debtor can afford to make the reduced payments that would be required under her IBR plan. Most recently, while employed, the Debtor's monthly IBR payments were $118.90, but because the Debtor is now unemployed, her monthly payments could be reduced to $0 without causing her to default on her current

IBR agreement. However, the mere fact that the Debtor can comply with her IBR program obligations without making any actual payments is not dispositive of the first prong of the *Brunner* test. *See Durrani v. Educ. Credit Mgmt. Corp.* (*In re Durrani*), 311 B.R. 496, 506 (Bankr. N.D. Ill. 2004). Rather, her current ability to maintain a basic standard of living and still make some payment on her student loan debt is the focus of the inquiry.

The Debtor has gone through several periods of unemployment and underemployment throughout her career and she has always been quick to find new work. On several occasions, she has leveraged temp jobs into permanent positions and earned promotions during her longer-term employment. The Debtor has also shown a commendable willingness to take positions in a variety of industries and capacities in order to sustain herself, as well as a willingness to relocate when necessary. The Debtor presents herself as capable and intelligent, and she has no serious health problems, nor any major recurring expenses. There are no significant impediments to the Debtor securing employment in the very near future, as she admitted at trial. Based on these factors, the Court concludes that despite the Debtor's unemployment at the time of trial, she has the ability to secure employment soon, maintain a minimal standard of living, and make some payments on her student loan debt in the future. *See Rhodes*, 464 B.R. at 923.

Assuming the Debtor does find a job in the near future, her IBR payments would most likely resume at a manageable level. Because the Debtor does not have any dependents, significant health needs, or major recurring expenses, requiring her to make student loan payments in the future should not impair her

ability to maintain a minimal standard of living once she is employed again. Thus, the Debtor has not met her burden of proof on the first prong of the *Brunner* test.

### B. No Additional Circumstances Exist Preventing The Debtor From Paying Her Student Loans In The Future

The second prong of the *Brunner* test requires an analysis of whether there are "additional, exceptional circumstances, strongly suggestive of continuing inability" to make the student loan payments "for a significant portion of the repayment period." *Goulet*, 284 F.3d at 778 (citation omitted). This prong is often described as requiring a "certainty of hopelessness." *Id.* Factors that can be considered include the debtor's age, education, job skills, employment history, any significant physical or psychiatric impediments to securing employment, the size of the debt, and whether the debtor has any dependents. *See Krieger*, 713 F.3d at 884; *Goulet*, 284 F.3d at 778.

"'Certainty of hopelessness' is a tough standard and one that can generally only be met by the truly disabled or debtors whose repayment periods have already run so that the certainty of their inability to pay for the entire period is a matter of fact rather than speculation." *Simmons v. U.S. Dep't of Educ.* (*In re Simmons*), 334 B.R. 632, 636 (Bankr. C.D. Ill. 2005), aff'd No. 06-3012, 2006 WL 2556581 (C.D. Ill. Aug. 31, 2006). That is, if the repayment period has elapsed or nearly elapsed, there is no need to attempt to predict the debtor's future. *See Lewis v. Ill. Student Assistance Comm'n* (*In re Lewis*), 276 B.R. 912, 917 (Bankr. C.D. Ill. 2002) ("The extended repayment term of the restructured loan has also expired, in April, 2001. This expiration alone may be sufficient to satisfy *Brunner's*

second prong.").

At trial, ECMC argued that the original repayment period is irrelevant to the analysis because the second prong of the *Brunner* test is entirely prospective in nature. The Court disagrees with the assertion that the original repayment period is never relevant to a *Brunner* inquiry. The issue to be determined is whether a debtor's circumstances are "likely to persist for a significant portion of the repayment period of the student loans." *Roberson*, 999 F.2d at 1135. Thus, the *Brunner* test takes into consideration a student loan's actual repayment period. Nevertheless, because the Debtor has refinanced and consolidated her student loans several times, the original repayment period is not dispositive of the issues here. Under the current terms the Debtor agreed to prior to her bankruptcy filing, she has over twenty years left in her repayment period.

As set forth above, the Debtor is capable and intelligent with no health problems or other impediments to being gainfully employed. She has had an unfortunate employment history through no apparent fault of her own that has caused her to not reach her full earning potential. But she falls seriously short of having any exceptional circumstances that would lead to the conclusion that she will not be able to make payments on her student loans in the future. And she is nowhere close to meeting the "certainty of hopelessness" standard generally required to satisfy the second prong of the *Brunner* test. She has failed to meet her burden of proof on this issue.

### C. The Debtor Has Made Good Faith Efforts to Repay the Student Loan

The third prong of the *Brunner* test requires the Debtor to prove that she

-12-

"made good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1136. This is measured by the Debtor's "efforts to obtain employment, maximize income, and minimize expenses." *Id.* "The debtor is not required to have paid a certain percentage or minimum amount of the loan in order to show good faith." *Clark v. U.S. Dep't of Educ.* (*In re Clark*), 341 B.R. 238, 255 (Bankr. N.D. Ill. 2006). Likewise, debtors are not penalized for failing to make student loan payments when they lacked the ability to do so. *Id.* What matters for a showing of good faith is that the Debtor was not willful or negligent in bringing about her unfortunate financial condition. *Id.*

The Debtor has met her burden to prove her good faith in repaying her student loan debt. Over time, she has made significant efforts to increase her income and decrease her expenses. She has been willing to take jobs outside of her chosen field and in a variety of industries and locales to boost her income over time. Most recently, she moved in with her mother to save money. This is undoubtedly evidence of the Debtor's good faith. The Debtor has also made at least $15,000 in payments on the student loan—more than the original principal balance of about $14,000. It is also significant that the Debtor has been attempting to pay down her student loan debt for the past twenty years, despite facing an increasing loan balance. This is not a case of a recent graduate trying to escape student loan debts before beginning a lucrative career. The Debtor has made substantial, though futile, efforts to pay down her student loan debt.

ECMC argues that this prong was not satisfied because the debtor failed to make payments on the student loan debt during periods of gainful employment and because many of the payments were the result of involuntary wage garnishments. It was not necessary for the Debtor to make payments on the debt when she could not afford to do so, and most of the time that she could afford such payments, she made them. Further, as the Debtor testified at trial, the fact that she took no action to terminate ECMC's prior wage garnishments indicated a willingness to have the debt automatically paid from her income. The Debtor's payment record, though imperfect, is sufficient for a finding of good faith.

ECMC also argues that because the Debtor's monthly payment under her IBR plan is currently zero due to her unemployment, she cannot, as matter of law, establish good faith in her effort to discharge her student loan debt. Essentially the argument is that because the Debtor can clearly meet her current monthly obligation, it is *per se* bad faith to seek a discharge of the debt. But that argument is not supported by controlling law. Participation in an alternative payment program is not required to meet the standards of the *Brunner* test. *Krieger*, 713 F.3d 884-85; *Herrmann v. U.S. Dep't of Educ. (In re Herrmann)*, 2000 WL 33961388, at *3 (Bankr. C.D. Ill. Feb. 7, 2000). The Debtor's past participation in the IBR program is evidence of her good faith efforts to pay her student loans. The availability of the IBR program to the Debtor in the future does not preclude a current finding of good faith.

### IV. Conclusion

The Debtor's financial situation is unfortunate, but more than that is required for a finding of undue hardship under the demanding *Brunner* test. The Debtor has shown good faith in her efforts to remain employed and pay down her student loan debt. But as a healthy, intelligent, relatively young worker with a proven ability to secure productive employment, the Debtor is unable to prove that her student loan obligations prevent her from maintaining a minimal standard of living, now or in the foreseeable future. Thus, for the foregoing reasons, the Debtor's student loan debt will not be discharged.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###